IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 15-36 Erie |
| | ) | |
| ELIZABETH McMAHAN | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For several years while employed at National Tool Grinding, McMahan took advantage of her trusted position and falsified commission reports and sold merchandise at drastic and unapproved discounts to earn commissions to which she was not entitled. Her actions resulted in a loss to National Tool Grinding of more than $550,000. She should receive a sentence well within her applicable guideline range.

## FACTUAL BACKGROUND

Elizabeth McMahan worked for National Tool Grinding (NTG), which is based in Erie, Pennsylvania. In addition to its original business, tool grinding, NTG's focus is selling products through the telephone and Internet via a subsidiary known as US Netting. US Netting sells a variety of products including ropes and nets. The company advertises its products primarily through the Google and Bing search sites and has a website that lists products and prices. Prospective customers can order from the company by utilizing the website or speaking with a sales employee. On a normal basis, NTG employs approximately twenty individuals, including three sales employees. The job of the sales employees is to take incoming customer requests and bid out a product that fits the customer's request. Sales employees price the product and calculate the total cost to the customer. NTG's products have established prices and guidelines that give the sales employees limited flexibility to waiver from those prices. For example, these guidelines allow sales employees to independently provide no more than a 10% discount on a

large multi-thousand dollar order.  However, the 10% discount was not to be provided automatically on every order.  Rather, it was reserved for those situations involving high dollar orders that could only be closed with the provision of the discount.  Any other discount needed the NTG President's permission and authorization. In most instances, the President of NTG would only consider giving out a discount greater than 10% on an order that was in the tens of thousands of dollars.

Once a customer contacted NTG, a sales employee would touch base with the customer, provide a quote usually via email and then handle the order if applicable.  The sales employee then submitted an order to a vendor and/or to NTG's workshop for production.  Through the use of a spreadsheet, each sales employee calculated their own total sales and then submitted their sales figures and commission calculations to the President of the company for payroll processing.

Starting in 2004, Elizabeth McMahan began working as a sales employee at NTG. McMahan continued to work in that capacity until August 12, 2014, when McMahan hurriedly left NTG after the company issued new procedures for the sales employees' payroll processing.  Prior to August 2014, sales employees did not provide an invoice or proof of sale at the time that the sales/commission spreadsheet was submitted to the President for payroll processing.  Starting in August 2014, new company policy was that all sales employees would provide some proof that a sale was made as detailed on the commission spreadsheet.  Soon after the sales employees were informed of the new policy, McMahan started removing personal items from her desk, many of which had been on her desk for a lengthy period.

Not long after the new sales policy was announced, McMahan met with Lisa Masters, Human Resource Manager for NTG, and expressed concerns with the new sales policy.  McMahan then left Master's office and never returned to NTG.  McMahan was not fired during the meeting,

nor did McMahan quit during the meeting or thereafter.   However, soon after, NTG received a notice from Pennsylvania Unemployment Compensation (PUC) that McMahan had provided notice that she was terminated by NTG and had filed for unemployment compensation.   NTG issued a letter to PUC, denying McMahan's claim and advising that it was McMahan who had walked out of NTG, never to return.   The PUC ultimately denied McMahan's claim for unemployment compensation.

Due in part to suspicions by NTG regarding McMahan's sudden departure after the implementation of the new policy, NTG asked their computer staff and their accountant to investigate McMahan's sales activities while at NTG.   The computer staff found Excel spreadsheet files in the recycle bin of McMahan's work computer.   McMahan tried to delete the files but was unable to permanently delete them.   These files, along with invoices for sales made by McMahan were given to NTG's accountant.   During the examination, the accountant found from mid-2010 through August 2014, approximately $200,000 in fraudulently obtained payroll commissions for McMahan that had no supporting documentation.   The fake sales and resulting commissions had been submitted by McMahan to NTG for payment.

As detailed above, NTG sales employees provided Excel spreadsheets with commission calculations to the NTG President.   The NTG President relied entirely on his employees' veracity when submitting their commission calculations.   The accountant found that the Excel spreadsheet calculations submitted by McMahan were manipulated to show sales that did not exist, but for which McMahan claimed and then received commissions.

FBI Special Agent Mike Thoreson reviewed the spreadsheets and invoices and also determined that McMahan submitted fraudulent sales reports so as to receive commissions on sales that never occurred.   The findings showed that McMahan listed sales on the Excel sales spreadsheet

which included invoice numbers, customer name, date of sale, and the amount of the sale. However, no actual invoices were found for many of these sales.  Furthermore, the Excel spreadsheets found in the recycle bin of McMahan's work computer contained rows that were hidden prior to the printing of the spreadsheet.  When printed, McMahan made the spreadsheet appear in such a way that no one would ever know that there were hidden rows within the spreadsheet.  Special Agent Thoreson hand added each sale that was listed on the spreadsheets given by McMahan to the NTG President.  The totals found by Special Agent Thoreson did not match the totals on the printed spreadsheet McMahan provided to NTG for payment of her commissions.  Special Agent Thoreson's calculated total was much lower than the commission figure provided by McMahan to NTG for payment.  In summary, McMahan input false sales into the Excel sales spreadsheets, which then drove up the total amount of sales, but when the report was printed, McMahan hid those false sales. The total figure on the bottom of the spreadsheet still included those false sales, thereby increasing McMahan's commission.

Further investigation revealed that McMahan sold NTG products to a company for which McMahan offered to discount the purchase price if the company provided McMahan with two tickets to a Katy Perry concert.  McMahan made the unsolicited request through her work email to the company on April 15, 2014.  The company agreed to provide McMahan the concert tickets in exchange for the discounted price on the product being ordered.  McMahan then applied an $846.80 discount on the order.  McMahan emailed the original sales invoice to the company on April 1, 2014.  Upon their agreement, McMahan emailed the company a new sales invoice with the applied discount on April 17, 2014.  When McMahan provided the final invoice to the NTG President, McMahan listed the new discounted sales price.  Furthermore, McMahan listed the date of the sale as March 31, 2014, making it appear that the final sales price was always that price.

4

For the months following, McMahan used her work email to send the company update emails concerning how and where to pick-up the tickets.  NTG's President advised that he never knew about the tickets nor would he have ever authorized the discount.  The discount was provided to the customer by McMahan for her own personal benefit.  The deal was made in secret and the invoice supplied to NTG was falsified.  NTG did not receive any benefit from the discount and ultimately lost out on $846.80 from the sale.

Investigation into other sales by McMahan, including those reflected in Counts 1 through 24 of the Indictment (Count 25 reflects the sale involving the Katy Perry tickets), showed a pattern of selling NTG products for far less than what would have been authorized by NTG.  McMahan sold products for discounts ranging from 30-90% off NTG's authorized prices.  McMahan kept her scheme hidden from other employees and from the NTG President.  McMahan's fraudulent scheme dates back to at least 2012.  As with the Katy Perry discount, McMahan supplied paperwork that offered no information or data that illustrated such deep discounts were being given out by McMahan.  An analysis of McMahan's sales for 2012 through 2014 revealed well over $1 million in unauthorized discounts were applied.

NTG sales employees are paid primarily via commissions.  Each employee receives a small base salary, but in order to make the kind of money that McMahan was making each year, sales employees needed to sell.  McMahan had to sell at least $40,000 worth of products each month prior to receiving a commission.  After $40,000, McMahan would then receive 5% from each sale.  Obviously, sales employees paid primarily on commission don't earn as much money without frequent sales.  By applying such deep discounts, McMahan exponentially increased her chances of making sales.  For example, in 2012 McMahan sold a product for approximately $30,000.  The actual price of the product at the time was over $100,000.  The discount given to the customer by

McMahan was over 70%.  McMahan made the sale, but the sale cost NTG $70,000 in lost revenue.

Furthermore, with such a deep discount applied, it likely cost NTG more to make/obtain the

product and provide it to the customer then the $30,000 they received.  As with the Katy Perry

deal, McMahan made this sale for her own benefit.  Overall, Elizabeth McMahan's scheme

resulted in lost revenue for National Tool Grinding of more than $550,000.

During at least the years 2012 through 2014, McMahan was at the top for sales in

comparison with the other NTG sales employees.  For the year 2012, McMahan's income was over

$160,000.  In 2013, it was over $165,000.  In 2014, McMahan's partial year's salary was over

$84,000.  The investigation has revealed that from her scheme to defraud, McMahan received

approximately $50,000 additionally per year from mid-2012 through the end of her employment

at NTG in August 2014.

From at least 2013 through 2014, McMahan spent on average over $8,000 each month on

credit cards.  During this same time frame, McMahan had a monthly mortgage payment of over

$1,500, loan payments for vehicles, and miscellaneous every day expenditures reflected in her

bank account.   Analysis of McMahan's income and that of her husband's, revealed that without

the income McMahan made from selling products for deep unauthorized discounts and/or from the

commissions on the fake sales, McMahan would never have been able to spend the thousands she

did almost every month.  Some of these expenditures included cruises, trips to New York City

and/or Toronto, along with frequent restaurant expenditures.  Analysis of McMahan's banking and

credit card activity revealed that for the most part, McMahan spent her income on pleasure related

items that benefited McMahan or her family.

## SENTENCING IN THE WHITE-COLLAR CONTEXT

Although the Guidelines are advisory and are not presumptively reasonable, the Court must still afford them due weight as a factor under 18 U.S.C. §§ 3553(a)(4) and (a)(5). In addition, the Guidelines continue to be a vital force in sentencing as they "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).  The Guidelines embody the factors and considerations set forth in § 3553(a), and the "upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." *Id*. at 348. While not presumptively reasonable, courts do recognize that the Guidelines were, "drafted by a respected public body with access to the best knowledge and practices of penology[.]" *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007); *Gall v. United States*, 552 U.S. 38, 46 (2007) ("[E]ven though the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."). In the end, it is important to recognize that the Sentencing Commission "developed these guidelines as a practical effort toward the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system." U.S.S.G, Ch. 1, Part A, Policy Statement 3.  Accordingly, both the Supreme Court and the Third Circuit have emphasized that "a within guidelines range sentence is *more likely* to be reasonable than one that lies outside the advisory guidelines range[.]" *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) (emphasis in original); *United States v. Cooper*, 437 F.3d 324, 331-32 (3d Cir. 2006).

Particularly in the white-collar crime context, it is important to recognize that the Guidelines represent the considered judgment, after much study on the subject, of the importance of deterrence in white-collar crime. *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989)

(citing S.Rep. No.98-225, at 76 (1983)). "Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment.'" *Id.* The Senate Report on the Sentencing Reform Act "gave specific examples of areas in which the prevailing sentences might be too lenient, including the treatment of major white-collar criminals." *Id.* Thus, a number of policy statements were included in the Guidelines to ensure that these crimes were treated with the appropriate weight. *See e.g.*, U.S.S.G. Ch. 1 Pt. A(4)(d) ("Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes."); U.S.S.G. § 2R1.1, Background Note ("Under the guidelines, prison terms for [anti-trust] offenders should be much more common, and usually somewhat longer, than typical under pre-guidelines practices."). *See also United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes ...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses."); U.S.S.G., Ch. 1, Part A, Subpart 4(d) (criticism of pre-guidelines light sentences for what the Sentencing Commission views as "serious" offenses, such as fraud offenses and other economic crimes) ."); *United States v. Engle*, 592 F.3d 495, 502-03 (4th Cir. 2010) (remanding tax case for resentencing because, among other things, "[t]he district court did not acknowledge the policy statements" addressing the seriousness of tax offenses.).

Deterrence is particularly important in a case like this one arising in a context where fraud is perpetrated over a very lengthy period by an employee in a  trusted position with obvious access to and control over significant aspects of the business' operation.  In such circumstances, the potential social costs of conduct lacking personal integrity are high and

demands, as a counter balance, significant deterrence.  Recognizing this fact, the Guidelines were viewed as a "solution" to the non-deterrent effect of probationary sentences in the white-collar context.  *See* U.S.S.G. Ch. 1 Pt. A(4)(d).   As a matter of policy, the Guidelines reflect a belief that "definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm."  *Id.*

In *United States v. Dougherty*, 98 F.Supp.3d 721, (E.D. Pa. 2015), Judge Baylson cited deterrence as the most important goal in a series of sentencings that the court was preparing to impose.  Judge Baylson discussed, at some length, the importance of deterrence in the white-collar context, and noted that the Court of Appeals for the Third Circuit "recently affirmed a sentence for conspiracy to commit extortion that 'cited deterrence as a major consideration' because of the nature of the crime and the defendant."  *Id.* at 728 (quoting *United States v. Castro*, 573 F. App'x 214, 218 (3d Cir. 2014)); *see also* Stephanos Bibas, *White-Collar Plea Bargaining & Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005) ("[W]hite-collar crime is more rational, cool, and calculated than sudden crimes of passion or opportunity, so it should be a prime candidate for general deterrence. An economist would argue that if one increased the expected cost of white-collar crime by raising the expected penalty, white-collar crime would be unprofitable and would thus cease."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crimes therefore can be affected and reduced with serious punishment."); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (holding that economic and fraud-based crimes are prime candidates for general deterrence because they are more rational, cool, and calculated than crimes of passion or opportunity).

The Guidelines also stress the importance of the loss amount in determining white-collar sentences, choosing to view the seriousness of the crime from the perspective of the victims who lost the money as opposed to the perspective of the defendant. *See, e.g.*, *United States v. Hoffecker*, 530 F.3d 137, 200-201 (3d Cir. 2008) (quoting background comment to USSG § 2F1.1). The Guidelines direct district courts to sentence defendants convicted of crimes, like this defendant, based on the amount of the loss, rather than on the defendant's motive. "It makes little difference to their victims if [the perpetrators] transfer funds to themselves, to third parties, or if they pile up the money in the parking lot and burn it. The same amount of money has been taken from the victim no matter what the fate of the funds." *United States v. Seacott*, 15 F.3d 1380, 1387 (7th Cir. 1994). Thus, the loss amount remains a sound basis for determining the seriousness of an offense, particularly when one looks, as the Guidelines advise, from the perspective of the victims of the fraud.

In *United States v. Negroni*, 638 F.3d 434 (3d Cir. 2011), the Third Circuit, in reversing sentences in which the district court varied downward extensively in the white-collar context, discussed the importance of jail sentences in the white-collar context. *Id*. at 446. It is discussed that, "if a district court seeks to vary from the Guidelines recommendation of incarceration for persons who have committed serious white-collar crimes, it must provide a thorough and persuasive explanation for why the congressionally-approved policy of putting white-collar criminals in jail does not apply." *Id*.

## 18 U.S.C. § 3553(a) Factors

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) strongly suggests that the most appropriate sentence is one within the advisory guideline range. The factors the Court must consider, as set forth in Section 3553(a), include the following: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).  These factors obviously express Congressional intent that judges focus on far more than just the defendant's background and characteristics when sentencing.  A consideration of all the Section 3553 factors ensures that the victims' and society's interests are protected.

## 1.  The Nature and Circumstance of the Offense and the History and Characteristics of the Defendant

In the Factual Background section of this pleading, the circumstances surrounding McMahan's conduct were explained in a nutshell. The government will not belabor the point any further except to note that the Guidelines call for a period of incarceration for a reason.  By all objective measures, including the loss amount, McMahan's trusted position and the length of the fraud, McMahan's crime is serious.  At any point while committing the fraud, McMahan could have ended it and tried to rectify the situation.  Instead, she continued to defraud in pursuit of her own economic interests with little care for the harm caused.

11

Any focus on McMahan's background or the collateral consequences of her conviction is misplaced. The impact on the victim is still the same regardless of the impact of the conviction on McMahan. She did not participate in the conspiracy so she could pay unexpected medical bills or relieve another's suffering. She took part in the scheme to protect her economic self-interest. That is just plain, old fashioned greed not worthy of a downward variance. McMahan did not care if her employer's economic situation was harmed so long as she reaped the economic benefits of her fraud. She clearly and consistently stole from her employer simply to enhance her lifestyle and pay for things that she could not have otherwise afforded.

Obviously, McMahan has had a far better life than most defendants who come before the Court for sentencing. She grew up in a stable, loving and supportive home. She graduated from college with a degree in business. She has a lengthy work history. She has no significant health issues. There is no history of substance abuse.

Rather than take full advantage of her opportunities, McMahan chose to repeatedly defraud her employer, who unaware of what she was doing considered her a valued employee. That is not behavior deserving of a home detention sentence. Certainly, McMahan has positive characteristics, including, most notably, the lack of a criminal record. A minimal criminal record, however, is already taken into account in the Guidelines. *United States v. Jacobs*, 293 F. App'x 884 (3d Cir. 2008) (citing *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006)). It is not unusual for white-collar criminals to have no or minimal criminal record. *United States v. Hagerman*, 525 F. Supp. 2d, 1058, 1064 (S.D. Ind. 2007); *United States v. Vigil*, 476 F. Supp. 2d, 1231, 1298, 1302 (D. N.M. 2007).

McMahan's personal circumstances and the effect of a conviction upon her do not take her case out of the heartland of typical white-collar offenders. A defendant's personal

circumstances are not normally a legitimate basis for a downward variance. *See United States v. Lychock*, 578 F.3d 214, 220 (3d Cir. 2009) (defendant's personal circumstances and lack of criminal history do not ordinarily justify a significant downward variance from the Guidelines); *United States v. Harris*, 602 F.App'x 77 (3d Cir. 2015) (affirming denial of variance based on nature and circumstances of the offense and the characteristics of the defendant despite strong employment record).

The United States anticipates that McMahan will submit letters of support from friends and family.  Warm letters from friends, family, and colleagues may be honest and heartfelt. But they are not atypical in white-collar cases. "[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003). Courts should "view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id.* And they often do. *See*, *e.g.*, *United States v. Deason*, 622 F. App'x 350, 358 (5th Cir. 2015) (upholding refusal to vary based upon, *inter alia*, "letters of support submitted by his friends and family"); *United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive letters "by no means out of the ordinary" because privileged white-collar offenders "often have impressive records of civic and philanthropic achievement"); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) ("record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence"); *United States v. Kohlbach*, 38 F.3d 832, 837-39 (6th Cir. 1994) (not unusual for white-collar offender to have been leader in community charities, civic organizations, church efforts, and have performed prior good works); *United States v. Gilmore*, 2012 WL 1377625, at *7 (W.D. La. Apr. 18, 2012) (noting defendant "has done good works in the community, but so

have many others who have appeared before this Court, particularly those charged with white-collar crimes); *United States v. Barbera*, 2005 WL 2709112, at *13 (S.D.N.Y. Oct. 21, 2005) ("high regard in which he is evidently held by the colleagues and friends who have written letters on his behalf does not distinguish him from other white-collar criminals").  Plainly, letters of support do not justify a significant downward variance in this case.

> **2.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A sentence within the advisory guidelines range reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.  The government has already discussed the seriousness of the offense.  The sentence, however, must also promote respect for the law and provide for a just punishment.  Promoting respect for the law is, from the government's perspective, a primary goal of this sentencing that is very much aligned with the goal of general deterrence discussed below.  Rather than repeat arguments addressed below, the government will simply note that by imposing serious punishments for serious crimes, the Court promotes respect for the law.

McMahan points directly to the collateral consequences of her conviction, including the loss of her career, reputation, profession, and financial resources, in support of a sentence of home detention.  The collateral consequences of a conviction do not justify a downward variance of the sort sought by McMahan.  In *United States v. McFarland*, 468 F. App'x 164, 168 (3d Cir. 2012), the Court of Appeals for the Third Circuit affirmed the district court's rejection of that argument.  In a footnote in that opinion, however, the Court went much further than simply rejecting the argument.  It wrote as follows: "Additionally, a strong case can be made that McFarland's 'collateral punishment' argument is the type of **frivolous, non-colorable argument**

that a district court need not even consider during sentencing. . . . [I]f mere reputational damage due to criminal conviction constituted grounds for variance, then presumably every criminal defendant could argue for a lighter sentence on that basis." *Id*. at 169, n. 4. (emphasis added) (citations omitted); *see also United States v. Vigil*, 476 F.Supp.2d 1231, 1315 (D.N.M. 2007) (rejecting variance argument based on collateral consequences).

The Sixth Circuit has even held that the collateral consequences of a defendant's conviction are impermissible factors for a court to consider when fashioning sentence. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). The *Musgrave* court reasoned that "when a district court varies downward on the basis of the collateral consequences of the defendant's prosecution and conviction, the defendant's sentence will not reflect the seriousness of the offense, nor will it provide just punishment." *Id*.

Beyond the clear judicial disfavor for reliance on collateral consequences as a basis for a downward variance, there is the obvious fact that the collateral consequences claimed by McMahan were entirely foreseeable prior to her decision to repeatedly steal from her employer. McMahan has not explained why this Court should consider collateral consequences that McMahan clearly knew but chose to ignore.

### 3. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

The government simply does not have the resources to detect, much less investigate and prosecute, every instance of financial fraud. Thus, deterrence serves as an incredibly valuable service, reminding an individual who is contemplating fraud of the very real prospect of prosecution and punishment. A sentence of home detention here will do nothing to deter a defendant contemplating engaging in fraud. The distinct prospect of a lengthy jail sentence is quite likely to deter those considering taking advantage of their trusted positions.

15

The Court has a unique opportunity to send a clear message that individuals will be held accountable especially when they engage in purposeful and extended conduct like McMahan did here.  That message is likely to especially resonate in Erie's relatively small and tight knit community.

### 4.    The Guidelines and Policy Statements Issued by the Sentencing Commission

The advisory guideline range is 37 to 46 months.  The government has outlined the important policy statements of the Sentencing Commission.  The policy statements include the punishment of economic crimes more severely, the importance of deterrence in economic crimes, and viewing the losses in economic crimes from the perspective of the victims, rather than from that of the defendant.  All of those policy considerations are addressed at various other portions of this pleading.  Moreover, to the extent that the Court disagrees with any of those policy considerations, the Court must articulate and explain that disagreement. *United States v. Merced*, 603 F.3d 203, 221 (3d Cir. 2010).

### 5.   Impact on the victims

A sentence within the Guideline range will properly reflect the harm caused by McMahan's prolonged and recurring violation of the trust placed in her.  A portion of the victim impact statement provided to the Court by Paul and Lisa Galla, the owners of National Tool Grinding, clearly indicates the harm that McMahan has caused:

> Elizabeth McMahon's betrayal has greatly affected Lisa and I. We no longer have the inherent trust for employees we once believed was necessary to have a successful business. We treated Elizabeth McMahon like family, with no idea that she was stealing incredible amounts of money from us. Her actions caused hundreds of sleepless nights worrying about our business, wondering how we were going to keep the business alive and be able to pay our employees. The number of arguments and disagreements between my wife and I are countless over that four year period and my wife and I have lost the trust we once placed in others.

Elizabeth McMahon devastated a business, other employees and their jobs, and ruined the trust we placed in her as friend. Her actions were calculated, criminal, and repeatedly carried out over and over again for four years. She has showed no remorse or regret for what she has done, and we are asking you to sentence Elizabeth McMahon to prison to punish her for her crimes. We ask for a lengthy sentence not only for Elizabeth McMahon, but to also send a message to others as to the consequences they must face if they ever do the same criminal acts. Elizabeth McMahon stole from us for four years. We feel she should sit in prison for the same amount of time she committed her crimes - four years.

### 6.   The Need to Avoid Unwarranted Sentencing Disparities

As reflected in the very first section of the United States Sentencing Commission Guideline Manual, one of the primary purposes of the Guidelines was to achieve Congress' laudable goal of "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."  U.S.S.G. Ch. 1, Part A, policy statement 3.  Sentences within the advisory sentencing guideline range, of course, advance the goal of avoiding unwarranted sentencing disparities. *United States v. Kluger*, 722 F.3d 549, 569 (3d Cir. 2013) (citing *Gall v. United States*, 552 U.S. 38, 54 (2007)); *United States v. Jones*, 326 F. App'x 90 (3d Cir. 2009); *United States v. Bauer*, 529 F. App'x 275, 279, n. 4 (3d Cir. 2013). The Court of Appeals for the Third Circuit has repeatedly reversed sentences, particularly on government appeals, when Courts vary significantly and fail to explain how their sentences nonetheless address this important factor.  *See United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007); *United States v. Lychock*, 578 F.3d 214 (3d Cir. 2009); *United States v. Merced*, 603 F.3d 203, 221 (3d Cir. 2010); *Negroni*, 638 F.3d at 446.

It is also important to recognize that the "primary purpose" of 18 U.S.C. § 3553(a)(6) "was to reduce unwarranted sentence disparities nationwide[.]" *United States v. Willis*, 476 F.3d 103, 109 (2d Cir. 2007).  *See also United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007); *United States v. Damato*, 672 F.3d 832, 848 (10th Cir. 2012); *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013); *United States v. Dowdy*, 216 F. App'x 178, 181 (3d Cir. 2007).  In this

case, sentencing the defendant within the advisory guideline range advances the goal of national uniformity in sentencing.

As a valued and trusted employee, McMahan had a heightened duty to remain above reproach.  Rather than strive to avoid even the appearance of impropriety, she stole from her employer repeatedly over a long period with no sign that she was ever going to stop prior to being caught.   A home detention sentence would be unjust and would fail to reflect McMahan's conduct.

WHEREFORE, for the reasons set forth above, the Court should impose a sentence well within the advisory sentencing guideline range.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney


S/ Christian Trabold
CHRISTIAN A. TRABOLD
Assistant U.S. Attorney
PA ID No. 75013